INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, and its Local 117, Plaintiffs,

v.

ACME PRECISION PRODUCTS, INC., Defendant.

Civ. A. No. 81–70757.

United States District Court, E. D. Michigan, S. D.

Sept. 21, 1981.

William A. Wertheimer, Jr., Miller, Cohen, Martens & Sugerman, Detroit, Mich., for plaintiffs.

Delmer C. Gowing, III, Goodenough, Smith & May, Detroit, Mich., Donald S. Weiss, David Finch, Gottlieb & Schwartz, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This case is before the court on plaintiffs' Rule 56(a) motion for summary judgment to compel arbitration, and defendant's Rule 56(b) cross motion for summary judgment to dismiss Count II of the complaint. Plaintiffs, United Automobile, Aerospace and Agricultural Implement Workers of America and its Local 117 (the Union), brought suit under § 301 of the Labor-Management Relations Act against Acme Precision Products, Inc., a Delaware corporation. The complaint charged in Count II that Acme had violated the Collective Bargaining Agreement between the two parties by refusing to arbitrate a grievance brought by the Local. The facts are not disputed and only the arbitrability under the Collective Bargaining Agreement of that grievance is at issue on these cross motions. For the reasons given below, plaintiffs' motion to compel arbitration is denied and defendant's cross motion to dismiss Count II is granted.

## RELEVANT FACTS

Until January 31, 1981, plaintiff Local 117 served as bargaining representative for

Acme's production and maintenance employees at Acme's Outer Drive plant in Detroit. At this plant, the company manufactured precision die-cast automotive parts and, to a lesser extent, pulleys for general industrial use. It appears from the record that the pulley aspect of the business—known as Congress Drives Division—was sold on December 5, 1980 to a Texas concern. The die-casting business, meanwhile, was being phased out and culminated in the shut-down of the entire Outer Drive plant shortly before the expiration of the Collective Bargaining Agreement with Local 117. As a result, some work remaining was subcontracted out by Acme. One other event, significant for purposes of these motions, occurred on August 1, 1980 when Acme purchased the assets of one Viking Broach Co., a cutting tool business.

In response to all these activities, Local 117 filed a grievance on January 21 or 22, 1981 protesting:

a. the shutdown of Acme's Outer Drive plant (the die-casting operation);

b. the subcontracting of remaining work;

c. the sale of the Congress Drives Division (the pulley manufacturing operation); and

d. the purchase of Viking Broach Co.[1]

The union sought to invoke the mandatory arbitration provision[2] of the Collective Bargaining Agreement to resolve the grievance. Acme refused to arbitrate because it maintained that the grievance was not subject to arbitration. The union then commenced this action to compel Acme to arbitrate.

## DISCUSSION

Any discussion of the arbitrability of labor disputes begins with *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). The Court there held that federal courts are empowered by § 301 of the National Labor Relations Act to specifically enforce promises to arbitrate labor grievances, and it articulated a national labor policy favoring arbitration of industrial grievances. However, the medley of cases known as the Steelworkers Trilogy established the broad guidelines which the courts have since followed in ruling on arbitrability.

*Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), held that courts should not weigh the merits of grievances in determining arbitrability, and that when parties have agreed to submit all contract grievances to arbitration, the courts are "confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *Id.* at 568, 80 S.Ct. at 1346. In *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the Court directed arbitration where the contract excluded from arbitration "matters which are strictly a function of management" but also provided for arbitration of "differences . . . as to the meaning and application" of the collective bargaining agreement. The grievance was based on subcontracting of work which could have been done by employee/union members. *Id.* at 576, 80 S.Ct.

---

1. Grievance No. DI–8431: The Union protests the shutdown of the Outer Drive plant, the sub-contracting of remaining work, the sale of the Congress Drives Division and the purchase of Viking Broach Company, Inc. These actions, which resulted in the elimination of the employment of employees in the bargaining unit represented by the Union, were taken by the Company without first providing the Union with information as to the proposed decisions and thereafter bargaining with the Union regarding those decisions, all in violation of the agreement between the parties including but not limited to the following provisions: Article I, Sections 7 and 8.

The Union requests reinstatement of all laid-off employees with full back pay and benefits, a return of the sub-contracting work to the Outer Drive plant, a sale of Viking Broach Company, Inc., and the use of the assets from the sale to provide work for bargaining unit employees plus such further relief as is equitable and just.

2. Art. I paragraph 43—*STEP FIVE*: If a grievance is still not settled after it has gone through the previous STEPS of the Grievance Procedure, *the case SHALL be submitted to an impartial arbitrator selected by the parties from a list of arbitrators furnished upon written request of either party, by the American Arbitration Association.* (emphasis in original)

at 1349. The Court said, "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* at 582–83, 80 S.Ct. at 1353. The Court added, "In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail. . . ." *Id.* at 584–85, 80 S.Ct. at 1354.[3]

■■■ Yet despite the strong national policy favoring arbitration, not every grievance is arbitrable. The parties themselves, in the collective bargaining agreement or by some other contractual means, may exclude certain matters from the coverage of the arbitration provision. *Steelworkers v. Warrior & Gulf Navigation Co., supra,* at 584, 80 S.Ct. at 1354. The crucial question the court must always answer, assuming there is a valid arbitration agreement, is have the parties obligated themselves to submit the grievance to arbitration. *International Union of Operating Engineers, Local 139 v. Carl A. Morse, Inc.,* 529 F.2d 574 (7th Cir. 1976). Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. *Steelworkers v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 582, 80 S.Ct. at 1352–53; *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 241, 82 S.Ct. 1318, 1320–21, 8 L.Ed.2d 462 (1962).

■■■ In making this determination, the court is entitled to look to the four corners of the Collective Bargaining Agreement, and beyond if necessary. It is not limited to looking at the arbitration clause itself, and the mere allegation by either party that the Collective Bargaining Agreement has been violated is not sufficient to justify an order to arbitrate. *Independent Petroleum Workers v. American Oil Co.,* 324 F.2d 903 (7th Cir.), *aff'd.,* 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964). The aggrieved party must be able to point to a specific provision of the contract to support its demand for an arbitration order, at least where, as here, the arbitration clause is limited to "the meaning or application of the provisions of [the] contract."[4] *Boeing Co. v. International Union, United Automobile Workers,* 231 F.Supp. 930 (E.D.Pa. 1964), *aff'd.,* 349 F.2d 412 (3d Cir. 1965); *International Union of Electrical, Radio & Machine Workers v. General Electric Co.,* 407 F.2d 253, 260–61 (2d Cir. 1968), *cert. den.,* 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969).

The union here is able to point to no specific provision of the contract to justify its demand for an arbitration order, nor could it do so for there is none. The union's theory has been that the Collective Bargaining Agreement gave it joint responsibility with Acme to participate in and bargain over the decisions which resulted in the grievance. The ostensible source of this responsibility is Article I, paragraphs 7 and 8 of the Collective Bargaining Agreement.[5]

---

**3.** The third member of the trilogy, *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), is not relevant to this discussion.

**4.** Art. V paragraph 28—Any complaint on the part of the Union concerning conditions of employment, discharges or disciplinary action, or concerning the interpretation, application, or claimed violation, by the Company, or any of its provisions of this Contract [sic], shall constitute a complaint or grievance. . . .

Art. VI paragraph 44—The Arbitrator shall have authority to make decisions only with respect to grievances which involve the meaning or application of the provisions of this Contract, and he shall have no power to add or subtract from, or modify the terms of this Contract. . . .

**5.** Art. I paragraph 7—The purpose of this Agreement is to provide orderly collective bargaining relations between the Company and the Union, to secure a prompt and fair disposition of grievances, to eliminate interruptions of work and interference with the efficient operation of the Company's business.

Art. I paragraph 8—The Union recognizes the responsibilities imposed upon it as the exclusive bargaining agent for the employees, and realizes that in order to provide maximum opportunities for continuing employment, good working conditions, and fair wages, the Company must be in a strong market position,

Thus, the argument runs, Acme's unilateral decisions are "claimed violations" of the Collective Bargaining Agreement. Since a grievance is defined as "any complaint on the part of the union concerning ... [a] claimed violation [of the agreement]," and since all grievances are subject to mandatory arbitration [see FN 5 supra], Acme was obligated to arbitrate.

■ This is a clever argument, but it simply will not wash here. And the reason it will not is because paragraphs 7 and 8 of the Collective Bargaining Agreement will not stand up to the strained interpretation the union attempts to impose upon it. These clauses are part of Article I, the Recognition Article of the Agreement. Together they form a boilerplate harmony provision through which labor and management undertake to respect each other's interests and work together for the common good of the company and its employees. It is untenable to assert that by this language Acme agreed to arbitrate every dispute arising out of its failure to accord the union a joint role in the corporate decisionmaking process. Furthermore, the union is not, by affidavit or otherwise, able to show any collateral agreement which would support its position that Acme agreed to arbitrate grievances such as the one in question. That Acme never intended to arbitrate grievances of this sort is reinforced by other contract language.[6]

The union attempts to circumvent this reasoning by arguing that any interpretation by the court of the substantive provisions of the Collective Bargaining Agreement amounts to a decision on the merits of the grievance, forbidden by *Lincoln Mills, supra,* and the *Steelworkers Trilogy, supra.*

This is simply not the case. Those cases were never meant to place blinders on the courts. They merely require the courts to avoid taking into consideration the merits of a grievance in ruling on its arbitrability. The court has not done that here.

Nothing said here prevents management and labor from agreeing to arbitrate disputes such as the one at issue. Furthermore, nothing said here would have prevented the union from grieving Acme's activities had it been able to implicate specific contract provisions. See, e. g. *Bressette v. International Talc Co.,* 527 F.2d 211 (2d Cir. 1975).

■ But the court must refuse an arbitration order when the aggrieved party, be it labor or management, is unable to make at least a colorable claim under a specific provision of the Collective Bargaining Agreement. See *Boeing Co. v. International Union, United Automobile Workers, supra; International Union of Electrical, Radio & Machine Workers v. General Electric Co., supra.* And this sort of threshold determination must be made by the court. Here the union has failed to sustain its burden.

The court notes in passing that the Supreme Court has recently held that an employer has no duty to bargain under §§ 8(a)(5) and 8(d) of the National Labor Relations Act over a decision to close a segment of the employer's business. *First National Maintenance Corp. v. NLRB,* —— U.S. ——, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). The Court recognized that collective bargaining agreements rarely confer upon unions a right to participate in man-

---

which means it must produce at lowest possible costs consistent with Fair Labor Standards. The Union, through its bargaining position, assumes joint responsibility in the attainment of these goals.

6. Art. I paragraph 4—It is recognized that the Management of the Company, the control of its properties and the maintenance of order and efficiency is solely the responsibility of Management.

Art. I paragraph 5—Other rights and responsibilities belonging solely to the Management of the Company are hereby recognized, prominent among which, but by no means wholly inclusive are; the rights to decide the number and location of plants, amount of supervision necessary, type, quantity and replacement of machinery and tool equipment, products manufactured, methods of manufacture, work schedules, processes of manufacturing or assembling, together with the selection, procurement, sub-contracting (when sub-contracting production part the Company will advise the Shop Chairman when possible), designing, engineering, and control of raw materials, semi-manufactured and finished parts which may be incorporated in the products manufactured.

agement's control of the scope and direction of the business enterprise. At the very least, this case indicates that union participation in the core management functions is not a part of the national labor policy.

Plaintiffs' motion for summary judgment is denied, and defendant's cross motion for summary judgment is granted.

So ordered.