E.M. DIAGNOSTIC SYSTEMS, INC., a corporation of the State of Delaware,

v.

LOCAL 169, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA; and the American Arbitration Association.

Appeal of E.M. DIAGNOSTIC SYSTEMS, Inc., Appellant.

No. 86–5331.

United States Court of Appeals, Third Circuit.

Argued Nov. 7, 1986.

Decided Feb. 13, 1987.

Rehearing and Rehearing In Banc Denied March 12, 1987.

James J. Crowley, Jr. (argued), Linda B. Celauro, Carpenter, Bennett & Morrissey, Newark, N.J., for appellant.

Michael N. Katz (argued), Basil L. Merenda, Meranze & Katz, Philadelphia, Pa., for appellee Local 169.

Before SLOVITER, STAPLETON and GARTH, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

E.M. Diagnostic Systems, Inc. ("the Company") filed this suit seeking to enjoin arbitration of a grievance that concerned its use of an outside contractor to perform certain cleaning work. The district court held that the grievance was arbitrable and granted summary judgment to Local 169, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("the Union"). The Company now appeals. Because the grievance comes within the scope of the contract's broad arbitration clause and because there is no clear evidence of an agreed-upon intent to exclude such a grievance from the arbitration process, we affirm.

### I.

The Company and the Union are parties to a collective bargaining agreement effective from April 12, 1985, through April 11, 1988. This litigation involves a grievance filed on April 15, 1985, by Joseph Ehrman, a bargaining unit employee and a member of the Union's negotiating committee. The grievance form states:

This grievance concerns the matter about an outside agency doing our union job as porters. When we met on 4–12–85 the committee asked Jack Holms [sic][1] if they would be leaving since the strike was over and we were coming back to work. Holms [sic] said no. This is a clear case of violating the contract, also unfair to the 15 or so people still on layoff. So in concluding, since the agency is not part of local 169 we demand they be released and the jobs that are rightfully ours are [sic] given back to us.

App. at 61.

The collective bargaining agreement contains the following relevant provisions. Article V, "Functions of Management," provides:

*Section 1.* The management of the operation and the direction of the working force including the right to hire, suspend, transfer, promote and discharge or disci-

pline for just cause and to maintain discipline and efficiency of its employees, to establish reasonable work rules, *to subcontract,* to establish and discontinue incentive systems, and *to relieve workers from duty because of lack of work or for other legitimate reasons in accordance with this Agreement* are vested in the Company. The Union or its representatives shall not interfere with the exercise of such authority, or responsibility, *subject only to the restrictions contained in this Agreement.*

App. at 28 (emphasis added). Article XII, "Supervision," states:

Non-union personnel shall not perform the duties normally assigned to Union employees except for emergencies, experimental work, purposes of instruction, production or operational difficulties. The Company has the right to continue the practice of having non-union personnel participate in the taking of inventories.

App. at 37. In addition, Article X, "Seniority," provides that "seniority as used in this ARTICLE shall be the sole determining factor in cases of layoff and recall" and contains a detailed description of the seniority system. App. at 33. Section 6 of Article X states, "When any recall takes place, employees shall be rehired by seniority before new employees are hired; ...." App. at 35.

Article XIX, "Settling of Disputes," specifies the agreement's grievance and arbitration procedures. This article states:

*Section 1.* Any *dispute arising out of a claimed violation of this Agreement* shall be considered a grievance and shall be handled in the following manner:

The Company and the Union both encourage and endorse the principal [sic] that the Union person and his/her immediate supervisor sit and discuss any misunderstanding prior to the beginning of any formal grievance procedures.

*Step 1.* After such discussions and within three (3) working days following occurrence or first knowledge of the inci-

---

**1.** Jack Holmes is the Company's Vice-President for Personnel and Organization.

dent complained of, the employee, if not satisfied, shall reduce the grievance to writing and review the matter with his/her immediate Supervisor.... The Supervisor shall give an answer within three (3) working days....

*Step 2.* If the matter is not resolved in Step 1. the grievance shall be referred to the next level of management within one (1) week following the conclusion of Step 1.... The company shall provide a written answer within seven (7) working days.

*Step 3.* If the matter is not resolved in Step 2. it shall, within two (2) weeks of the answer, be referred to the Vice President, Personnel and Organization and the Business Agent for Local 169. These parties, or their designated representative(s), shall discuss, within four (4) weeks, the grievance.

*Step 4.* In the event of a failure to adjust the grievance satisfactorily by methods set forth in Step 3., the Company and the Union shall agree upon an Arbitrator satisfactory to both. In the event an Arbitrator cannot be decided upon, the parties will utilize the American Arbitration Association procedures for the determination of an Arbitrator. The Arbitrator's decisions shall be final and binding upon all parties.... The Arbitrator shall interpret and apply this Agreement but shall not rewrite or add to it.

App. at 41–42 (emphasis added).

## II.

Because the Company, in arguing that this grievance is not arbitrable under the collective bargaining agreement, relies on the history of its relationship with the Union, we begin with an account of the events that led up to the current dispute. Prior collective bargaining agreements between the Company and the Union, including the agreement in effect from 1981 to 1984, have also contained the "Functions of Management" provision, with its "right ... to sub-contract," quoted above.

The Company began contracting out cleaning work at its Gibbstown, New Jersey, facility to Service World Corporation on June 22, 1984. Four days later, a Union member filed the following grievance:

I'm writing this grievance on behalf of Union people who are both in building & out on Layoff & the Company hiring non union persons to do job that has always been considered a union job.

App. at 53. The Company's two written responses to this grievance each acknowledged subcontracting, but stated that the action was "in total conformance with the terms of our labor contract." App. at 53. Although the initial steps of the grievance procedure failed to redress the Union's problem, it did not seek to submit the 1984 grievance to arbitration.

At a July 19, 1984, meeting between Jack Holmes, the Company's Vice President, and the Union's grievance committee, the Union raised the issue of the contract with Service World. According to Mr. Holmes' affidavit, William Nolen, the Union's business agent, said then "that the agreement did provide that the Company can subcontract and that it had the right to do so in these circumstances." App. at 17. Nolen's affidavit, however, states, "At no time did I or any member of the grievance committee state at this meeting that the agreement provided the company with an absolute right to subcontract." App. at 106. Nolen's affidavit also states that the "right ... to sub-contract" language at no time gave the Company "the right to subcontract out bargaining unit work regularly performed by bargaining unit personnel." *Id.*

Negotiations for the current collective bargaining agreement commenced in September, 1984. During negotiations the prior agreement was extended, to expire on February 28, 1985. In the initial contract negotiation meetings, the Union proposed prohibiting the subcontracting of work by the Company. According to Holmes' supplemental affidavit, the Union later "modified its position, proposing that there be no subcontracting of work normally done by bargaining unit employees while bargaining unit employees were on layoff." App. at 97.

In November, 1984, the Company expanded its contract with Service World so that this company performed some of the cleaning work in the Gibbstown plant, as well as in the office, reception, and cafeteria areas. The Union did not file a grievance concerning the November expansion of Service World's work.

On March 1, 1985, the bargaining unit employees went on strike. On March 4 the Company contracted with Macke, a successor to Service World, to perform all the cleaning work at the Gibbstown facility. The Company contends that at an April contract negotiation meeting the Union president, Joseph Lyons, voiced concern that if the Company could subcontract janitorial work, then it could subcontract all bargaining unit work. Nolen, who was present at this meeting, states in his affidavit that he did not hear Lyons make any such statement.

The current collective bargaining agreement was signed in April of 1985. It made no change in the "right ... to sub-contract" language contained in the prior agreement. Nolen's affidavit states that after execution of the 1984–88 agreement,

> a bargaining committee member asked the employer when outside employees who had been contracted to perform the parties' work in question during the strike would be released as required under the contract. The employer through its authorized representative advised the union that it intended to use the outside contractor to perform the plant janitorial work despite the clause in question.

App. at 107. Holmes' supplemental affidavit recounts that after agreement on a new contract was reached, he stated that the employees of the subcontractor would remain on the job, but that all strikers should nonetheless return to work, reporting to their supervisors.

On April 15, Union member Ehrman filed the grievance at issue in this case. On April 26, 1985, Holmes gave the company's written response to a Union shop steward. The response states:

> The Company has the right to sub-contract work. The grieved subject does not, in any way, violate the collective bargaining agreement. Grievance denied.

App. at 61. According to Holmes' affidavit, he told the shop steward at that time that it did not seem necessary to utilize the subsequent steps in the dispute resolution procedure that provided for further discussion, because the parties' positions on the subject were known.

The Union's attorney sent the Company a letter dated May 31, 1985, suggesting the names of arbitrators for an arbitration pursuant to the dispute resolution procedures of the contract. In reply the Company's attorney wrote, "[I]t is clear that the parties intended to exclude the subject of the instant grievance from arbitration. Accordingly, the Company views the matter as not subject to arbitration." App. at 65. The Union continued to go forward with preparations for arbitration.

### III.

■ On review of a summary judgment, the appellate court is required to apply the same test that the district court should have used. Taking the non-movant's factual allegations as true, we must determine whether the moving party is entitled to judgment as a matter of law. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

■ The relevant labor law is well-settled. Arbitration is the preferred method for resolving disputes between a union and an employer. *Butler Armco Independent Union v. Armco Inc.*, 701 F.2d 253, 255 (3d Cir.1983). Arbitration, however, "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Therefore, whether a collective bargaining agreement creates a duty to arbitrate a particular grievance is an issue for judicial determination. *AT & T Technologies, Inc. v. Communications Workers of America,* —

U.S. ——, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). If the contract contains an arbitration clause, there is a presumption of arbitrability in that

"arbitration should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

*AT & T Technologies*, 106 S.Ct. at 1419 (quoting *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53). Where, as in the instant case, the arbitration provision is a broad one,

"[i]n the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

*AT & T Technologies*, 106 S.Ct. at 1419 (quoting *Warrior & Gulf*, 363 U.S. at 584–85, 80 S.Ct. at 1353–54). A further settled principle of labor law is that,

in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." *American Mfg. Co.*, 363 U.S., at 568, 80 S.Ct., at 1346 (footnote omitted).

*AT & T Technologies*, 106 S.Ct. at 1419. As the Supreme Court noted in *Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960), "[t]he processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware."

■ Thus, our analysis will be directed to three issues: (1) Does the present dispute come within the scope of the arbitration clause? (2) does any other provision of the contract expressly exclude this kind of dispute from arbitration? and (3) is there any other "forceful evidence" indicating that the parties intended such an exclusion? Whether the contract allows the Company to subcontract the work in dispute is not relevant to our analysis of any of these issues.

The collective bargaining agreement in this case provides for arbitration of "any dispute arising out of a claimed violation of this Agreement." The Union argues that it has made a claim that the employer's conduct violates the agreement and that this "claimed violation" alone is sufficient to bring the dispute within the scope of the agreement's broad arbitration clause. Such an interpretation of the contract, however, leaves the scope of the arbitration clause subject to the unilateral and unfettered discretion of the Union. The Company insists that, given its explicit right to subcontract and the other provisions of the contract, there is no language in the agreement from which the Union's claim can be said to "aris[e] out of." On this basis the Company argues that the Union has not stated a grievance within the scope of the arbitration clause. The Union responds that it can, if necessary, point to several provisions in the agreement that relate to this dispute. The Union warns, however, that under *AT & T Technologies* an examination of the merits of the Union's claim is reserved for the arbitrator.

It will suffice for present purposes to hold that a claimed contract violation comes within the scope of an arbitration clause of this character when the subject matter of the grievance is one that is within the zone of interests that have received protection in the collective bargaining agreement. To require more, we believe, would infringe upon territory reserved for arbitrators in *AT & T Technologies*.

As the Company stresses, the contract bestows a "right ... to sub-contract." It is apparent on the face of the contract, however, that this right is not absolute; it is "subject ... to the restrictions contained in this Agreement." Limits on the right to subcontract would be implicit, however, even if they were not so explicitly declared. An absolute right to subcontract would include the right to subcontract all work of the bargaining unit and would be inconsistent with the agreement's recognition of the Union as the bargaining agent for the Company's employees.

Moreover, the interests of Union members in being able to perform the work of the bargaining unit are recognized and protected in more specific provisions of the agreement. In Section 1 of Article V, the section that sets out the right to subcontract, the employer's right to "relieve workers from duty" and thereby deprive them of their right to perform the work of the bargaining unit is limited to non-arbitrary actions. The right to relieve workers may be exercised only "because of lack of work or for other legitimate reasons in accordance with this Agreement." Article XII protects Union members' interest in bargaining unit work free from competition with "non-union personnel," at least where that personnel is supervisory and perhaps more broadly. Article X recognizes the interest of laid-off Union workers in the work of the unit by requiring their recall before the recall of less senior employees or the hiring of new ones.

Based on these provisions, we have no difficulty concluding that the subject matter of the Union's grievance comes within the zone of its protected interests under the collective bargaining agreement. Accordingly, we find that this is a "dispute arising out of a claimed violation of" the agreement.[2] We therefore turn to the questions of whether the agreement expressly excludes this dispute from the arbitration procedure and, if not, whether there is "forceful evidence" indicating that the parties intended to exclude a dispute of this kind from arbitration.

The answer to the first of these questions is undisputed. The contract contains no provision expressly excluding from arbitration claims of contract violation that involve the subcontracting of work. While the second of these questions warrants more extended discussion, we believe it equally clear that the Company has presented no other forceful evidence indicating that the parties meant to exclude a dispute of this type from the arbitration process.

The mere fact that the Union has not pressed other complaints about subcontracting to arbitration proves nothing about its ability under the contract to do so. Indeed, the Union's filing of grievances in June, 1984, and April, 1985, and the Company's treatment of them as complaints entitled to processing under the first three steps of Article XIX indicate that both parties contemplated resolution of such a complaint under that article, which provides for arbitration as the final available step for all previously unresolved disputes.

Nor do we find the required "forceful evidence" in the history of the collective bargaining between the Company and the Union. Accepting the Company's version of that history, there is nothing in its evidence that suggests an intent to exclude

**2.** The cases relied upon by the Company in arguing the contrary involve both more narrow arbitration clauses and situations in which the subject matter of the union's grievance was wholly unrelated to any interest protected by the collective bargaining agreement. In *Boeing Co. v. International Union, United Automobile, Aerospace and Agricultural Implement Workers,* 231 F.Supp. 930 (E.D.Pa.1964), *aff'd* 349 F.2d 412 (3d Cir.1965), for example, the arbitration process in the contract was limited to grievances involving a specific provision of the agreement. The court held a grievance protesting the failure to distribute Christmas turkeys barred from arbitration because "[t]here is no provision specific or otherwise in the agreement relative to the distribution of Christmas turkeys." 231 F.Supp. at 932. *Halstead Industries, Inc. v. United Steelworkers,* 432 F.Supp. 109, 111 (W.D. Pa.1977), similarly rejected arbitration because arbitration was limited, under the contract, to "application of particular clauses of this Agreement" and none of the provisions pointed to by the Union was related in any way to the subject matter of the grievance.

from arbitration grievances regarding the subcontracting of work. Contrary to the Company's suggestion, the fact that the Union sought to negotiate a specific limitation on the Company's right to subcontract work does not demonstrate that the Union viewed the prior contract as containing no implied limitations. More importantly, however, even if it did suggest that the Union held this view, this bargaining history would provide us with no indication of whether the parties' minds ever met on *the issue of excluding subcontracting grievances from arbitration.* The same can also be said for Mr. Holmes' account of the statement made by the Union's business agent allegedly acknowledging the Company's right to sub-contract work. However relevant that statement might be to the merits of the Company's case on the subcontracting issue, it does not enlighten us on whether the parties agreed to limit the arbitration clause of the agreement to less than its apparent scope.[3]

In essence, we believe the Company's argument reduces to an assertion that its right to subcontract work is so clear on the face of the agreement that there is no need for arbitration. This is but another way of saying that the Union's grievance is frivolous. We are not free to so characterize the Union's position; *AT & T Technologies* teaches that we must not address the merits of the grievance "even if it appears to

the court to be frivolous." 106 S.Ct. 1415 (1986). Decisions on the merits, whether easy or difficult, must be left to the arbitrator.[4]

■ Since we have determined that the Union's claim must be allowed to proceed to arbitration, it is premature to conclude, as the Company would have us, that any award made by the arbitrator would "rewrite or add to" the collective bargaining agreement in violation of Article XIX. If the arbitrator renders an unlawful award, the aggrieved party has available the remedy of a suit to vacate. *See, e.g., Sears, Roebuck & Co. v. Teamsters Local Union No. 243,* 683 F.2d 154 (6th Cir.1982).

## IV.

The district court's grant of summary judgment to the Union will be affirmed.

GARTH, Circuit Judge, dissenting:

I cannot agree with the majority that the Company agreed to arbitrate its right to subcontract work. Not only does the Collective Bargaining Agreement state otherwise, but the parties' bargaining history giving rise to the negotiated Agreement of the parties of April 12, 1985, demonstrates that the Company at no time consented to arbitrate its absolute right to subcontract, a right granted by the Agreement.

---

3. In stressing the importance of bargaining history, the Company relies on *Independent Petroleum Workers of America v. American Oil Co.,* 324 F.2d 903 (7th Cir.1963), aff'd by an equally divided court without opinion, 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964) and *Local No. 725, International Union of Operating Engineers v. Standard Oil Co. of Indiana,* 186 F.Supp. 895 (D.N.D.1960). In *Standard Oil,* the Union had repeatedly sought to broaden the scope of a relatively narrow *arbitration* clause to include disputes like the one it wished to arbitrate and Standard Oil consistently refused to accept any change. The Court understandably concluded that the language of the arbitration clause and this bargaining history indicated that the parties had not agreed to arbitrate the dispute that the Union wanted to arbitrate. In *American Oil,* the Union had unsuccessfully tried to negotiate a clause specifically prohibiting or limiting the right to contract out work. The existing collective bargaining agreement contained no reference to the subcontracting of work and the

arbitration clause expressly provided that either party could refuse to arbitrate any matter not covered by the agreement. The Court held that the plaintiff was barred by *res judicata* and that in any event the contract, properly construed, did not evidence an intent to arbitrate subcontracting issues. While it noted in passing that the "bargaining history ... fortifies the conclusion ... that plaintiff's [arbitration] claim is without merit," the Court also stated that the bargaining history was "of course not controlling." 324 F.2d at 907. We doubt that the *American Oil* Court would have found the bargaining history there to be the kind of forceful evidence referred to in *AT & T Technologies.* In any event, in the context of this case, we believe that the Company's evidence regarding bargaining history is ambiguous at best.

4. We consider ourselves foreclosed by *AT & T Technologies* from addressing the dissent's assertion "that no provision of the Collective Bargaining Agreement has been violated."

Not only has the majority redrawn the parties' Agreement, but, moreover, because the arbitration clause here requires as a threshold condition that arbitration be restricted to "any dispute arising out of a *claimed violation of this agreement ...*" and no colorable claim of any violation of the Agreement has been identified, it is clear to me that the majority is improperly compelling the Company to submit the issue of subcontracting to arbitration. I therefore dissent.

## I.

In essence, and without repeating the detailed background leading to this proceeding, it appears that in its relations with the Union, the Company has always reserved for itself an absolute right to subcontract and that this right, although contested at bargaining intervals by the Union, was at no time relinquished. This right is found in the "Functions of Management" provision of the parties' Collective Bargaining Agreement. Article V, App. at 28.

Over the years the Company and the Union have consistently agreed that "the management of the operation and the direction of the working force including the right ... to subcontract [is] ... vested in the Company.... The Union shall not interfere with the exercise of [the Company's] authority ... subject only to the restrictions contained in this Agreement." *Id.* Thus, at the outset, it is apparent that it is the Company, and the Company alone, which is entitled to make all determinations with respect to subcontracting, and that the Union has agreed that the Company shall perform that function without interference by the Union.

True, the Union did provide that this power of the Company would be subject to other restrictions contained in the Collective Bargaining Agreement; but absent such restrictions—and as I demonstrate in this opinion, there are none—it cannot be questioned but that the ability to subcontract was unequivocally granted to the Company.[1]

Indeed it is significant to me that at no time has the Union ever questioned this interpretation. Until this moment, the Union has never argued that the Company has violated its reserved right to subcontract. Even now, rather than challenging the Company's interpretation of the Agreement, the Union argues only that three discrete provisions, found elsewhere in the Agreement, constitute restrictions or cutbacks on the unambiguous authority of the Company to subcontract, such that arbitration should be allowed.

The Union claims that a provision of the agreement relating to "Supervision," Article XII, App. at 37, is such a restriction. It claims that the Agreement's "Union Recognition and Security" provision, Article II, App. at 26, constitutes such a restriction. Lastly, it asserted at oral argument and only obliquely in its brief, that the "No Strikes or Lockouts" provision of the Agreement, Article IX, App. at 32, constitutes a restriction on the Company's right to subcontract.[2]

The majority, apparently unpersuaded by the Union arguments, supplements those arguments by suggesting that Article X, "Seniority," also constitutes a restriction. Maj. Op., at 96. Because the arbitration

---

1. Obviously this would not preclude the Union from seeking to compel the arbitrability of a practice which the Company claimed was subcontracting but which the Union claimed was not. That is a completely different case from the case presented here.

2. I have found it as difficult as the majority to identify the arguments made by the Union with respect to its claimed violations of the agreement. For instance, I cannot tell whether on appeal the Union is claiming that the "Functions of Management" clause itself constitutes a violation of the agreement. All that the Union states

in its brief is: "It is the union's contention that the subcontracting in question exceeds the scope and meaning of the right to subcontract set forth in Article V, Section 1." Appellee's Brief at 18. Yet in the district court, the Union apparently argued that the specific contracts provision that was violated by the Company was the "Functions of Management" clause. App. at 118. In any event the short answer to this argument, if indeed it is an argument, is that the "Functions of Management" provision is a *grant* of rights to the Company and not a *limitation* upon its rights.

clause requires arbitration only where a "... dispute arise[s] out of a claimed violation of [the] agreement," it is obvious that the Union must identify the restrictive clause and its violation as a threshold condition in order to succeed. As I explain below, it has not.

## II.

Arbitration is favored as a general matter in labor law, but it will be compelled only if the parties have agreed to have the particular dispute in question arbitrated. *See* Annotation, *Matters arbitrable under arbitration provisions of collective labor contract*, 24 A.L.R.2d 752 (1982 Supp.) (collecting cases). An express provision excluding a particular claim from arbitration will suffice to immunize that claim from compulsory arbitration. *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union, AFL–CIO*, 430 U.S. 243, 250–53, 97 S.Ct. 1067, 1071–73, 51 L.Ed.2d 300 (1977). Furthermore, where a union cannot point to any specific provision of an agreement which it claims has been violated, the arbitration of a grievance will not be compelled. *Boeing Co. v. International Union, U.A.W.*, 231 F.Supp. 930 (E.D.Pa.1964), *aff'd*, 349 F.2d 412 (3d Cir. 1965); *Halstead Industries, Inc. v. United Steelworkers*, 432 F.Supp. 109 (W.D.Pa. 1977).[3]

## A.

The majority opinion has strained to find that the subcontract disputed by the Union in this case arises out of some "violation of this Agreement." In my opinion, this attempt to discover a violation where none exists fatally flaws the majority opinion and therefore its conclusion.

---

**3.** *Boeing* held that where an arbitration clause limited arbitration to "the provisions of the agreement," 231 F.Supp. at 931, the absence of a specific provision referring to the subject of the grievance prevented compulsory arbitration. *Boeing*, 349 F.2d at 413. The majority (maj. op., at 96, n. 2.) attempts to distinguish *Boeing* on the ground that *Boeing* interpreted a more limit-

### 1. Supervision

First, the Union contended that Article XII, App. at 37, dealing with "Supervision," restricted the Company's right to subcontract and therefore was violated by the subcontracting practice of the Company. Article XII, "Supervision," provides:

> Non-union personnel shall not perform the duties normally assigned to Union employees except for emergencies, experimental work, purposes of instruction, production or operational difficulties. The Company has the right to continue the practice of having non-union personnel participate in the taking of inventories.

App. at 37.

There is no evidence that this clause of the Agreement which excludes non-union personnel from taking inventory, and which permits them to perform union work in emergencies and for purposes of instruction, means anything other than what it says. It is patent that Article XII deals *solely* with supervisors and with defining those particular situations when managerial supervisory personnel may be used for non-managerial tasks. It goes without saying that none of those situations is implicated by the Company's subcontracting practice at issue in this case. Article XII leaves no room even for an arguable interpretation that it in any way constitutes a limitation or restriction on the right of the Company to subcontract.

### 2. Recognition Clause

In an effort to find some clause in the Agreement which would support an argument for arbitrability of the Company's disputed subcontract, the Union and the majority opinion look to Article II, the "Un-

---

ed arbitration clause than the arbitration clause in this case, but it fails in its attempt.

In the instant case, the arbitration clause requires that as a threshold condition, any claimed dispute must arise out of a violation of the agreement. Article XIX, App. at 41. *Boeing* does not stand for the proposition that such a condition need not be satisfied by the claimant.

ion Recognition and Security" clause.[4] That clause provides in relevant part:

*Section 1.* The Company recognizes the Union as the sole and exclusive collective bargaining representative for all its hourly and warehouse employees at its plant in Gibbstown, New Jersey exclusive of executives, engineering, sales, watchmen, office and plant clericals, professional and technical employees, maintenance employees and supervisors as defined by the NLRA.

Article II, App. at 26.

The Union claims a violation of Article II by stating no more than:

The right to subcontract involves a Term of Art which requires the application, interpretation and integration of Article V, Section 1, the recognition clause of the contract, Article XII and other relevant contract terms as well as the history of the parties relationship and law of the shop as they pertain to bargaining unit work and subcontracting and the parties' negotiating history in order to determine the scope of that right. Clearly, this is for an arbitrator to determine.

Appellee's Brief at 18–19.

The majority, in evident disregard of the mandate that a dispute to be arbitrable must arise from a violation of the Agreement, has been obliged to develop and substitute its own doctrine of when these parties must arbitrate. It has evolved a concept of "zone of interests" that must be protected. Maj. Op., at 95. The majority, including the Recognition clause within its newly minted "zone of interests," finds that clause to have been violated. "An absolute right to subcontract would include the right to subcontract all work of the bargaining unit and would be inconsistent with the agreement's recognition of the Union as the bargaining agent for the Com-

pany's employees." *Id.* Such a conclusion is not only negated by the specific evidence in this case, but it is also negated by case law which holds that a recognition clause alone will not support the claim that arbitration may be compelled in connection with the Company's right to subcontract. *See Independent Petroleum Workers of America, Inc. v. American Oil Co.,* 324 F.2d 903 (7th Cir.1963), *aff'd per curiam,* 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964); *Newspaper Printing Corp. v. NLRB,* 692 F.2d 615, 622 (6th Cir.1982); *see also International Union v. Acme Precision Prod.,* 521 F.Supp. 1358 (E.D. Mich.1981).

In this case, during one of the negotiating sessions with the Union in April 1985, the Union President, Joseph Lyons, "... voiced concern that 'if the Company could subcontract porter work, it could do so with all the bargaining work.' "[5] App. at 18. It is obvious that the majority, for want of any better argument has resurrected the arguments made by Lyons, at the negotiation. Yet the result of that negotiation was neither a lack of recognition of the Union, nor a restriction on the Company's right to subcontract. Indeed, it was after the negotiations had concluded that the "Functions of Management" clause, giving the Company the absolute right to subcontract, was reaffirmed.

Moreover, contrary to the majority's holding,—a holding announced without supporting authority—it is clear that unless the actual abolition or essential definition of the bargaining unit is at stake (neither of which is at stake here), a recognition clause alone is insufficient to provide the basis for arbitration of subcontracting. *Newspaper Printing Corp. v. NLRB,* 692 F.2d at 622. "A recognition clause covers

---

To the contrary, *Boeing* holds that such a condition must be met.

**4.** Apparently, so little was thought of this argument that it was not raised by the Union in the district court. The district court's opinion does not even refer to the Recognition clause as a clause which may have been violated by the Company's subcontract practice.

**5.** This statement appears in the Company's affidavit in support of its position that the Union abandoned its demand for subcontracting approval. No denial of the fact that Lyons made this statement or voiced his concern that the Company could subcontract all bargaining work can be found in the record. The most that appears is that the Business Agent for the Union claims "not [to] recall" hearing the statement attributed to Lyons. App. at 107.

people and cannot be legally extended to cover functions so as to bar forever the Company's ability to negotiate concerning the proper assignment of those functions." *Id.* at 622.

The majority's argument proves too much. First, it must be emphasized that no issue has ever been presented in this case that *every* position in the plant has been subcontracted as the majority hypothesizes. Second, if the Recognition clause had the effect attributed to it by the majority, it would override all other contractual restraints to which a union and management might otherwise agree.

### 3. No Strike Clause

The last argument was made by the Union at oral argument. There, the Union argued that the "No Strikes or Lockouts" clause of the Agreement (Article IX) restricts the Company's right to subcontract. It is not surprising that this purported "restriction" does not find direct expression either in the Union's brief or in the majority opinion. The Supreme Court in *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 584, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960), recognized that such an argument was only tenable where the Company had not expressly reserved to itself the right to subcontract in the "Functions of Management" clause. Here, of course, the Company had expressly reserved to itself in the "Functions of Management" clause the right to subcontract, a right expressly agreed to by the Union.

### 4. Seniority

Although in its appeal the Union itself did not urge or rely upon Article X, "Seniority," as a restriction on the Company, the majority now suggests that the "Seniority" provision is a restrictive clause which was violated by the Company's subcontracting practice. The argument points to language in the "Seniority" clause which indicates that "when any recall takes place, employees shall be rehired by seniority before new employees are hired ..." *See* Maj. op., at 92.

The answer to this argument and undoubtedly the reason it was not urged by the Union, is that although workers elsewhere in the E.M. Diagnostics plant were on a layoff status, none of the workers displaced by the subcontracted janitorial workers either came from layoff status, or failed to be recalled to work after the strike. App. at 16. To hold that the "Seniority" provision of the Agreement governs the subcontracting dispute in the present circumstance would necessarily imply that the reach of the "Seniority" clause encompasses all and every decision affecting personnel. The Union by its silence on this issue has obviously declined to embrace such a tortured reading of the Agreement.

### B.

Having examined each and every purported restriction on the Company's absolute right to subcontract, and finding that the Union and the majority cannot even agree on which clause of the Agreement has been violated by the Company's subcontract practice, it is apparent that the Union's threshold burden of demonstrating a colorable dispute arising out of a claimed violation of the agreement has not been met. Indeed the majority in its opinion obviously encountered the same difficulty in identifying a specific provision of the Agreement which was violated, for as I have noted, the majority was obliged to resort to developing and drafting a new "zone of interests" provision—a provision that the majority has now substituted for the agreed upon terms of the agreement.

Thus, the majority holds today that even though arbitration is mandated only where a dispute arising out of a claimed violation occurs, it is now sufficient in order to require arbitration, to merely identify some "zone of interest" into which the subject matter of some grievance might possibly be deemed to fall. In so holding, not only does the majority depart from the parties' Agreement as to what *is* required for purposes of arbitration, but it now re-writes the Collective Bargaining Agreement to provide that arbitration must be compelled

whenever a dispute, even if it does not arise out of a violation of the Agreement, falls within a "zone of interest"—a term that has never been defined even in the majority opinion itself.

Search as one may, it is abundantly clear that no provision of the Collective Bargaining Agreement has been violated. *See Independent Petroleum Workers,* 324 F.2d at 906.[6] Furthermore, none of the provisions identified by the majority opinion or by the Union can be deemed to relate even colorably to the subcontracting at issue here. See *Halstead Industries v. United Steelworkers,* 432 F.Supp. 109 (W.D.Pa. 1977). Hence, it is evident to me that the majority has erred egregiously in its analysis, and thus in its conclusion.

### III.

Having demonstrated that the threshold condition of the arbitration clause has never been satisfied, it would appear to me that no more need be written to conclude that the Company was correct in its position. If more were needed, however, the evidence of the parties' bargaining history conclusively establishes that not only was arbitration over subcontracting excluded, but that "forceful evidence" in the record reveals that at no time had the parties ever intended to arbitrate over the issue of subcontracting.

*Warrior & Gulf* instructs that arbitration may not be compelled where there is an express exclusion of a subject from arbitration based on the contract taken as a whole, or where "forceful evidence of a purpose to exclude the claim from arbitration" exists. *Warrior & Gulf,* 363 U.S. at 585, 80 S.Ct. at 1354. In this case, we have both: the bargaining history of the parties, which resulted in the "Functions of Management" clause, is easily the equivalent of an express exclusion from arbitra-

tion. *See Petroleum Workers.* Similarly, the record evidence is forceful in demonstrating the parties' intent to exclude subcontracting as a subject of arbitration.

### A.

It is sufficient to satisfy the "express exclusion" concept explained in *Warrior & Gulf* that the bargaining history of the parties and the language of the Agreement constitute the equivalent of such an expression. That principle was confirmed in *Independent Petroleum Workers of America, Inc. v. American Oil Co.,* 324 F.2d 903 (7th Cir.1963), *aff'd per curiam,* 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964). In *Independent Petroleum Workers,* the Union was defeated in its bid to submit to arbitration its grievance that the Company had breached its Collective Bargaining Agreement by contracting out crane work. As in the present case, the Collective Bargaining Agreement contained a clause limiting binding arbitration only to questions arising out of "alleged violations of the terms" of the agreement. *Id.* at 905. As in the present case, there was no specific clause which conferred upon the union any right to grieve with respect to subcontracting. If anything, the right to contract out work was less clearly reserved by the Company in *Independent Petroleum Workers* than it is in the Collective Bargaining Agreement in the instant case, where subcontracting is specifically identified as an absolute company prerogative in the "Functions of Management" clause.

The court in *Petroleum Workers* determined that the Company was not obligated by the terms of the agreement to submit the Union's subcontracting grievance to arbitration, and therefore held that subcontracting was not a grievable issue. To extinguish any doubt as to the fact that the express reservation of a right to decline to

---

**6.** In *Independent Petroleum Workers,* the Court was also faced with a claim that certain violations of the terms of the Collective Bargaining Agreement had occurred. In *Independent Petroleum Workers,* the arbitration provision, and the grievance, as I point out in the text *infra,* were the same as in this case. In holding that arbitration could not be compelled, the court aptly

rejected the Union's claim by stating: "[P]laintiff's claim for relief is based entirely upon the "alleged violations of the terms of this agreement." The question immediately arises—what terms? We find no answer.... The recognition clause makes no reference either to arbitration or to the contracting out of work ..." 324 F.2d at 906.

arbitrate issues not arising from the agreement was the equivalent of an express exclusion of the issue from arbitration, the court looked to the bargaining history of the parties:

> In brief [the bargaining history] shows that plaintiff [the Union] for many years had sought the inclusion of a clause in the collective bargaining agreement specifically prohibiting or limiting the right of the defendant to contract out work. This bargaining history while of course not controlling fortifies the conclusion which we have reached ...

*Id.* at 907.

Thus, where binding arbitration is limited to grievances arising out of claimed violations of the agreement, and the agreement is barren of any clause which provides a basis for the grievance, and where the bargaining history confirms that management had been given unbridled discretion to subcontract—a reservation equivalent to an express exclusion—the Supreme Court in affirming the Seventh Circuit *Petroleum Workers* case, has determined that arbitration may not be compelled.[7]

The record recited in the majority opinion is conclusive as to the failure of the Union to make subcontracting arbitrable. I suggest that the majority's attempt to water down the impact of the parties' bargaining history by calling it "ambiguous at best," maj. op. at 97, n. 3, requires not a fair but rather a distorted reading of the record, which has been detailed in the majority opinion. Thus, I conclude that when the bargaining history of the parties is fairly read, it is evident that the "Functions of Management" clause, which evolved from the contractual negotiations of the parties and from their actions in reliance upon their agreement, constitutes the equivalent of an express exclusion from arbitration of any matter dealing with subcontracting.

.

### B.

Even without regard to the fact that the parties' agreement provided for the express reservation of subcontracting from arbitration, at the least the record demonstrates "forceful evidence" as that term has been characterized, that subcontracting had been excluded from arbitration by the parties. *See Warrior & Gulf; see also AT & T Technologies, Inc. v. Communications Workers of America,* — U.S. —, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

Essentially, the evidence reveals that the Union at no time sought to grieve "subcontracting" under any of its agreements prior to the present Agreement. All of its prior Agreements contained "Functions of Management" clauses identical to the clause in the present contract. It was that very clause which the Union tried but failed to modify, and on which agreement was reached when the present contract was signed. The Reply Brief of the Company catalogs the "forceful evidence" revealing the parties' intent to exclude subcontracting from arbitration in the following manner:

> In November, 1984, the Company expanded its contract with Service World Corporation to have it clean several areas of the plant: the research and development and quality control areas (A97, par.

---

7. *See International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Acme Precision Products,* 521 F.Supp. 1358 (E.D.Mich.1981) (Union denied relief when it protested, *inter alia,* subcontracting, but could not point to any specific provision which modified unilateral management decision making authority). "Despite the strong national policy favoring arbitration," the majority wrote, "not every grievance is arbitrable.... The aggrieved party must be able to point to a specific provision of the contract to support its demand for an arbitration order, at least where, as here, the arbitration clause is limited to the 'meaning or application of the provisions of [the] contract.'" *Id.* at 1361 (citations omitted); *Jones Dairy Farm v. Local No. P–1236,* 760 F.2d 173, 175 (7th Cir.1985) (where clause in bargaining agreement reserved subcontracting right for the company, and arbitrable grievances were limited to those "arising out of agreement," court held that there would be no basis in the contracting-out clause itself for arbitration, since "It is as if the union had said, 'we want the arbitrator to decide whether the president of Jones Dairy Farm should be allowed to use a nondairy creamer in his coffee.'") *See also, Halstead Industries, Inc. v. United Steelworkers,* 432 F.Supp. 109 (W.D.Pa. 1977).

6; A 17, par. 11). Prior thereto, said cleaning in the plant had been performed exclusively by bargaining unit members. (A97, par. 6). The Union did not grieve or take any other action regarding the subcontracting of the cleaning work in the plant areas, previously exclusively performed by bargaining unit members, in November, 1984. (A97, par. 6). Rather, it made the matter an issue in the negotiations for a new collective bargaining agreement (A56, par. 19; A17, par. 10; A97, par. 7). The Union, through Nolen's [The Union's business agent] affidavit and its April 15, 1985 grievance, concedes each of the following facts: that the Company subcontracted cleaning work in the plant area in November, 1984; that said cleaning work had previously been performed by bargaining unit members; and the Union did not grieve or take any action with respect to said subcontracting. (A106, par. 5, 3d sentence and A61). By its failure to grieve, but rather raising it in negotiations for a new contract, the Union conceded the Company's right under the predecessor Agreement, identical in all material respects to the current Agreement, to subcontract cleaning work in the plant areas, previously performed by bargaining unit members.

Appellant's Reply Brief at 4–5.

The history of this dispute has been recounted here and by the majority. Given (1) the decision not to pursue the issue of arbitrability of subcontracting under the earlier Agreement; (2) the strike for a better new Agreement in which the issue of subcontracting figured; (3) the failed efforts during negotiations to incorporate an anti-subcontracting clause into the agreement; (4) the return to work of striking employees who agreed to subcontracting language identical to language in prior agreements and in the present Agreement; and (5) evidence that the Union employees returned to work notwithstanding the Company's continued use of subcontractors in the plant, it is clear that there was "forceful evidence" of an intention on the part of the union bargaining officials to treat subcontracting as a function absolutely reserved to management, and therefore excluded from arbitration.

## IV.

I have dissented from the majority opinion in this case because I believe the record and established precedent clearly reveal that (1) the "Functions of Management" clause granted an absolute right to the Company to subcontract with no interference from the Union; and that (2) when considered in the context of the remainder of the Collective Bargaining Agreement and the parties' bargaining history and actions, this clause is the equivalent of an express statement excluding subcontracting from arbitration.

Even if that were not enough, the record, which is virtually uncontradicted, demonstrates the necessary quality of "forceful evidence" of an intent to exclude subcontracting from arbitration. See *Warrior & Gulf, supra.*

In any case, the failure of the Union, and for that matter the majority, to identify any provision of the parties' Agreement which was violated—a threshold condition for arbitration—defeats the Union's position from the outset.

I believe that the majority's effort to require arbitration where it is not permitted represents a dramatic departure from established precedent. This is particularly so where the majority itself, in derogation of all established jurisprudence, has gratuitously rewritten the parties' Agreement in terms of "zones of interest" in order to provide for an arbitrable condition that could not otherwise be met.

The majority's decision in this case must inevitably lead to the confusion of the labor bar, unions, management, and district court judges. Rather than fostering the goals of predictability and precedential integrity in the interpretation of collective bargaining agreements, I fear that this decision by the majority will do just the opposite. It is for that reason that I not only respectfully dissent, but I urge consideration by the court in banc.